| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-2(c)**<br><br>Brian W. Hofmeister, Esq.<br>Law Firm Of Brian W. Hofmeister<br>3131 Princeton Pike, Building 5, Suite 110<br>Lawrenceville, New Jersey 08648<br>(P)(609) 890-1500<br>(F)(609) 890-6961<br>bwh@hofmeisterfirm.com | |
| In Re:<br><br>WHAIRHOUSE LIMITED LIABILITY COMPANY,<br><br>               Debtor. | Case No.: 23-17272(RG)<br><br>Chapter 11 (involuntary)<br><br>Judge: Rosemary Gambardella, U.S.B.J. |

**BRIEF IN SUPPORT OF THE CROSS-MOTION OF WHAIRHOUSE LIMITED LIABILITY COMPANY TO DISMISS THE PETITION PURSUANT TO 11 U.S.C. §303(b)**

Alleged creditors of Whairhouse Limited Liability Company ("Whairhouse") filed an involuntary chapter 11 bankruptcy petition against Whairhouse on August 22, 2023. An involuntary petition requires creditors to sign and the petitioning creditors are currently comprised of the following signatories: Alexis Morrillo, Frank Robinson, Michael Ventura, Rg3 LLC, Jermaine and Faleena Andujar, Samme Sheika, Nicholas Tish and Jonathan Gunn (collectively, the "Petitioning Creditors" or the "PCs"). The PCs' claims allegedly arise out of the execution by each PC of a Joint Venture Agreement between the individual PC and Whairhouse, executed on behalf of Whairhouse by Caesar Pina. All PCs to this petition are represented by a single attorney, Sean James Mack. As a companion to the involuntary petition, the PCs filed, through Mack, a motion to appoint a Chapter 11 Trustee (the "Motion to Appoint"). The Whairhouse cross motion

herein seeks to dismiss the involuntary petition pursuant to 11 U.S.C. § 303(b) and in furtherance thereof, makes the following legal argument.

    I.    **The Petitioning Creditors Lack Standing to Maintain the Involuntary Petition Under 11 U.S.C. §303(b)**

Section 303 of the Bankruptcy Code governs involuntary bankruptcy cases under chapters 7 and 11 and stipulates that an involuntary case may be commenced "only against a person . . . that may be a debtor under the chapter under which such case is commenced." 11 U.S.C. § 303(a). Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.), 594 B.R. 576, 585-86 (Bankr. S.D.N.Y. 2018).

A petitioning creditor bears the initial burden of establishing a *prima facie* case that it meets the eligibility requirements set forth in section 303(b) of the Bankruptcy Code. *See, e.g.,* In re Persico Contracting and Trucking, Inc., No. 10-22736 (RDD), 2010 WL 3766555, at *3 (Bankr. S.D.N.Y. Aug. 10, 2010); *See also* Platinum Fin. Servs. Corp. v. Byrd (In re Byrd), 357 F.3d 433, 437 (4th Cir. 2004); In re Gutfran, 210 B.R. 672, 673 (Bankr. D. Conn. 1997). Once a *prima facie* case has been established, the burden then shifts to the entity against whom the involuntary petition has been filed to demonstrate that the eligibility requirements have not been met. *See* In re Persico Contracting and Trucking, Inc., 2010 WL 3766555, at *3; In re Byrd, 357 F.3d at 439; In re Gutfran, 210 B.R. at 673.

Section 303 goes on to set forth the minimum number of creditors required to commence an involuntary case and contains restrictions as to which types of creditors may commence an involuntary bankruptcy case. Specifically, pursuant to section 303(b)(1), an involuntary case may be commenced "by three or more entities, each of which is either a holder of a *claim against such person* that is not contingent as to liability or the subject of a bona fide dispute *as to liability or*

*amount*, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least [$18,600.00] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims." 11 U.S.C. § 303(b)(1) (emphasis added). Section 303(b) thus requires that an involuntary petition be brought by at least three qualifying creditors and that each such creditor holds a claim *against the target of the involuntary petition*. 11 U.S.C. § 303(b)(1). (emphasis added)

In In re Allen-Main Assocs., Ltd. Pshp., 218 B.R. 278, 279 (Bankr. D. Conn. 1998) "[t]he alleged debtor argue[d] that § 303(b) impose[d] a dual requirement for eligibility to file an involuntary petition: the petitioner must hold a "claim," and the petitioner's claim(s) must constitute at least [$18,600.00] of unsecured debt." Id. In Allen-Main, the petitioning creditor held a non-recourse note and mortgage against the alleged-debtor's real property and was the sole petitioning creditor. Id. at 279. "In holding that a non-recourse secured creditor may not act as the sole petitioning creditor under § 303(b), the court notes that for the past one hundred years, U.S. bankruptcy statutes have required creditors filing involuntary petitions to hold unsecured debt." Id. at 280. In addition, the court held "[t]o the extent that CC Britain is undersecured or waives part of its secured claim against the alleged debtor, its secured claim is simply diminished rather than *replaced by* an unsecured claim." Id. (emphasis added).

The amounts of the claims of the PCs are in bona fide dispute because the specific "Joint Venture Agreements" executed by the PCs and Whairhouse are voided by N.J.S.A. §31:1-3 and §56:8-19. The JVAs are further voided by their general and comprehensive violation of the New Jersey State Consumer Fraud Act ("CFA"). The parties agree that each of the eight PCs executed a "Joint Venture Agreement" ("JVA") with Whairhouse. Each of the JVAs contains substantially

the same terms with the exception of the amount alleged.[1] The JVAs appear in some sense to create a capital contribution of the PCs to the Whairhouse for unspecified purposes. The Motion to Appoint attempts to specify parcels of real property intended to link specific PCs and the JVAs to those properties. However, the JVAs assemble more like standard loans with preposterous terms, shortened loan cycles, repayment terms that are handwritten and not countersigned and some that bear no resemblance to the general terms of business dealings, certainly not under the CFA.

> N.J.S.A. §31:1-3 provides:
>
> In all actions to enforce any note, bill, bond, mortgage, contract, covenant, conveyance, or assurance, for the payment or delivery of any money, wares, merchandise, goods, or chattels lent, and <u>on which a higher rate of interest shall be reserved or taken than was or is allowed by the law of the place where the contract was made or is to be performed</u>, the amount or value actually lent, without interest or costs of the action, may be recovered, and no more. If any premium or illegal interest shall have been paid to the lender, the sum or sums so paid shall be deducted from the amount that may be due as aforesaid, and recovery had for the balance only.
>
> <u>Id</u>. (emphasis added)

All of the JVAs contain language and terms demonstrating usurious interest under the laws of the State of New Jersey. In New Jersey, it is considered criminal usury if a lender charges an interest rate of 30% or more to an individual, or 50% or more on an entity (a corporation, limited liability corporation, etc.).[2] Thus, the PCs may be entitled, in the best case, to recover no more than the amount or value actually lent, leaving any remainder in bona fide dispute.

---

[1] The Motion to Appoint alleges that each of the PCs "invested" a specified amount toward the purchase of a parcel of real property in New Jersey. A noted exception is that Jermaine and Faleena Andujar are PCs but the Motion to Appoint does not allege that the Andujars sought purchase or contribution toward a specific parcel of real property.

[2] N.J.S.A. §2C:21-19. Wrongful Credit Practices and Related Offenses.

a. Criminal usury. A person is guilty of criminal usury when not being authorized or permitted by law to do so, he:

(1) Loans or agrees to loan, directly or indirectly, any money or other property at a rate exceeding the maximum rate permitted by law; or

Section 301(b) is construed to disqualify petitioning claims based on *any bona fide dispute as to amount*, even if some "portion" of claim is undisputed; this interpretation not only is consistent with legislative history of § 303(b), but with legislative history of previous Bankruptcy Act. In re Blixseth, 2013 Bankr. LEXIS 5807 (Bankr. D. Nev. July 10, 2013), *aff'd*, 581 B.R. 882, Bankr. L. Rep. (CCH) ¶ 83190, 2017 U.S. Dist. LEXIS 206513 (D. Nev. 2017). *See also* In re Mt. Dairies, Inc., 372 B.R. 623, 48 Bankr. Ct. Dec. (LRP) 161, Bankr. L. Rep. (CCH) ¶ 81016, 2007 Bankr. LEXIS 2457 (Bankr. S.D.N.Y. 2007). (Involuntary petition against alleged debtor was dismissed pursuant to 11 U.S.C.S. § 303(b)(1) because sole petitioning creditor failed to meet its burden of demonstrating that debtor was liable as to any particular amount; amounts asserted on involuntary petition not only included amounts disputed by debtor but amounts payable to separate entity of creditor and due from corporate entity other than debtor.) The presence of documentation by the PCs to support their claims is not currently in dispute, but the underlying claims are, even reaching the potential for criminal liability under both civil and criminal portions of the Consumer Fraud Act. There can be adjudged no higher dispute than the PCs violation of the CFA. According to the above case law, no portion of the involuntary claim may be in dispute. Thus, the PCs lack sufficient standing and the bankruptcy case must be dismissed.

II. **The Involuntary Petition is, in essence, a Two-Party Dispute that is Already Pending within a Several Courts of Competent Jurisdiction**

Section 303 of the United States Bankruptcy Code provides for the ability of noncontingent, undisputed claims against an entity to file an involuntary Chapter 7 or 11 proceeding. The remedy typically affords creditors protection from debtors who are making

---

(2) Takes, agrees to take, or receives any money or other property as interest on the loan or on the forbearance of any money or other interest in excess of the maximum rate permitted by law.

preferential payments to other creditors or dissipating the debtor's assets, and is available to three or more petitioning creditors, or one petitioning creditor with a minimum threshold claim amount. 11 U.S.C. §303(b)(1),(2).

The unusual nature of the involuntary bankruptcy petition leads to close scrutiny of such petitions by Bankruptcy Courts. Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.), 594 B.R. 576, 593-94 (Bankr. S.D.N.Y. 2018). See also In re Murray, 900 F.3d 53 (2d Cir. 2018). It is pivotal to recognize that creditors' ability to bring a debtor into bankruptcy can be abused. "In part because of the unusual nature of involuntary petitions, Congress provided bankruptcy courts with a variety of tools with which to police their use." Wilk Auslander LLP v. Murray (In re Murray), 900 F.3d 53 (2d Cir. 2018). By enacting section 303 Congress entrusted bankruptcy courts with the tools necessary to protect debtors from abusive involuntary petition practice. Fundamentally, Section 303(b) is a "gating" provision, intended to place limitations on the commencement of involuntary cases. Id. *See also* Taberna *generally*.

Misuse of the Bankruptcy Code was determined to exist and in Murray, the Second Circuit affirmed the bankruptcy court's conclusion that the petition was part of a two-party dispute brought solely as an enforcement device for which adequate remedies existed in state law, where the debtor neither wanted nor needed a bankruptcy discharge, and where there were no competing creditors. The court found the debtor's vigorous opposition to the petition relevant and determined that the interests of a debtor *must* be considered when determining whether to dismiss an involuntary petition, determining that the case involved only one creditor (or a group of creditors with similar interest holdings) and no risk of asset depletion in favor of other creditors, stating that the "two-party dispute"… "should not be in bankruptcy court to begin with". Id. at *4. There, the court

noted that there was no creditor body needing the protection of bankruptcy law, reiterating that "bankruptcy was created as a *collective remedy*, to achieve *pari passu* distribution amongst creditors…" Id. (emphasis in original). To the extent that the PCs' claims are in bona fide dispute or, in the best case, voided entirely under the CFA, Whairhouse possesses sufficient equity to demonstrate solvency due to its ownership of seven (7) other parcels of real property. The JVAs demonstrate only dispute between Whairhouse and the PC-class of alleged creditors. The PCs have already filed numerous actions in New Jersey State Court (Passaic County and Bergen County) seeking determinations of liability and making the same, or substantially similar claims as the PCs make herein. (See Griegel Cert., Ex. B). The PCs' goal to blur the jurisdictional lines as well as to force Whairhouse and its principals to fight on many different fronts is apparent. However, there is no immediate need for the Bankruptcy Court to be involved in what boils down to a dispute between Whairhouse and disgruntled lenders who have overtly obliterated basic contract law and enforcement of same.

### III. The PCs Have Employed Reprehensible Bad Faith Tactics To Attempt to Recover

In addition to the lack of standing of the Petitioning Creditors, the Court should dismiss the Petition based on bad faith. As set forth in the supporting documentation, the actions of the PCs in their various attempts to collect amounts alleged due and owing from Whairhouse and its principals are truly reprehensible. The documentation in the form of emails and text messages speak for themselves. Regardless of the Court's determination as to the validity and amount of the alleged claims (which Whairhouse thoroughly disputes), the resort by the PCs to disturbing criminal threats demonstrates fully that not only are the PCs forum shopping but intended the bankruptcy filing only to annoy and harass Whairhouse and its principals, which runs counter to the intent of the statute.

The Third Circuit has made it clear that an involuntary petition filed by a creditor as a debt-collection device or to gain an advantage in other pending litigation or over other similarly situated positions, constitutes bad faith, and warrants dismissal. See In re Forever Green Athletic Fields, Inc., 804 F.3d 328 (3d. Cir. 2015). In Forever Green, the court recognized that "[t]ime and again, we have emphasized that "good faith" filing requirements have "strong roots in equity." Id. at 332, (citing Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.), 200 F.3d 154 at 161 (3d Cir. 1999) Tamecki v. Frank (In re Tamecki), 229 F.3d 205 (3d Cir. 2000)). "At its most fundamental level, the good faith requirement ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy…as courts of equity, bankruptcy courts are equipped with the doctrine of good faith so that they can patrol the border between good- and bad-faith filings." Id. (citing In re Integrated Telecom Express, Inc., 384 F.3d 108, 119 (3d Cir. 2004); In re SGL Carbon, 200 F.3d at 161; In re Little Creek Dev. Co., 779 F.2d 1068, 1072 (5th Cir. 1986)).

The court emphasized that "the filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." Id. at 335 (quoting In re Reid, 773 F.2d 945, 946 (7th Cir.1985)). This can be significant for a company that is engaged in a licesning strategy since a licensee will be skeptical of whether its rights can be set aside by a Trustee or the Court. The court went on to state that "[g]iven these serious consequences, courts should be wary of creditors who may find alluring the 'retributive quality' of thrusting a debtor into bankruptcy. Allowing for the dismissal of bad-faith filings will encourage creditors to file petitions for proper reasons such as to protect against the preferential treatment of other creditors

or the dissipation of the debtor's assets. . . . Accordingly we hold that an involuntary petition filed under 11 U.S.C. §303 may be dismissed for bad faith. " Id.

In Forever Green, supra, the court adopted a "totality of the circumstances" standard for determining bad faith under § 303, a standard it found most suitable for evaluating the myriad ways in which creditors filing an involuntary petition could act in bad faith. The court stated that:

> "In conducting this fact-intensive review, courts may consider a number of factors, including, but not limited to, whether: the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing." Id. (emphasis added)

The totality of circumstances test has been followed among bankruptcy courts in this District. See In re Skyworks Ventures, Inc., 431 B.R. 573, 577 (Bankr. D.N.J. 2010). It has been stated that "[t]he court should consider both the objective facts surrounding the filing as well as ascertain the subjective motivations of the petitioning creditors for evidence of ulterior motives." In re Elsub, 66 B.R. 196 (Bankr. D.N.J. 1986). In support of this position, Whairhouse has submitted the certification of one of its attorneys, Steven W. Griegel, Esq., an a pleading in opposition in one of the many pending actions in Passaic County (the "Greigel Cert."). The Griegel Cert and Pleading at Exhibit "A" demonstrates the lengths to which some PCs will go to attempt to collect from Whairhouse and its principals. From the very texts, emails and other communications of the PCs themselves, it should be clear to this Court that the petition filing was

one driven by ill will, the desire to harass and perhaps even rage and revenge.[3] The communications from the PCs to the Whairhouse owners truly represent the worst of society and in some extreme examples potentially criminal activity, including but not limited to extortion, RICO violations and terroristic threats on top of unconscionable collection practices.[4] Further, the filing of the petition by the PCs in the range of an already pending order to show case in the Passaic County Action both demonstrates the PCs desire to obtain a tactical advantage in that and other actions and the PCs' use of the bankruptcy court as a further substitute for debt-collection activities and procedures. The Griegel Cert also demonstrates the presence of at least eleven *other actions* pending in Passaic County and Bergen County involving Whairhouse and its principals. The PCs are well covered legally and will garner no benefit from the bankruptcy court's involvement. To the extent the Court dismisses this matter, the bad faith analysis and commensurate reimbursement of attorney costs and legal fees is more than appropriate.

## CONCLUSION

The PCs in this involuntary filing have used and abused the legal system throughout the State of New Jersey and have attempted to do similarly here in the bankruptcy court. The essence of their attempt is in furtherance of an overarching plan to harass and annoy Whairhouse, but the PCs should not be permitted to employ the bankruptcy court's jurisdiction when they lack proper standing under 11 U.S.C. § 303(b). While there are any number of reasons why the Court should dismiss this case, the failure to do so will embroil this Court further in elements that have

---

[3] The PCs actions here certainly violate the New Jersey Unfair Debt Collection Practices Act, assuming the JVAs are enforceable in any event.
[4] Such threats may cause the PCs to be held liability for Whairhouse's and the Pina's "ascertainable loss" particularly with regard to the PCs apparent unconscionable collection practices under the CFA.

potentially criminal liability and will not yield the results the PCs are after in any event. The case should be dismissed.

RESPECTFULLY SUBMITTED,

/s/ Brian W. Hofmeister

BRIAN W. HOFMEISTER

Dated: September 26, 2023