**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br>Sean Mack<br>Darcy Baboulis-Gyscek<br>Pashman Stein Walder Hayden, P.C.<br>21 Main Street, Suite 200<br>Hackensack, New Jersey 07601<br>(201)488-8200<br>smack@pashmanstein.com<br>dbaboulis-gyscek@pashmanstein.com<br><br>*Attorneys for Interest Parties*<br><br>In re:<br><br>WHAIRHOUSE LIMITED LIABILITY COMPANY<br><br>                                Debtor. | Chapter 11<br><br>Case No. 23-17272-RG<br><br>Judge: Rosemary Gambardella, U.S.B.J. |

**PETITIONING CREDITORS' BRIEF IN OPPOSITION OF THE CROSS-MOTION OF WHAIRHOUSE LIMITED LIALITY COMPANY TO DISMISS THE PETITION PURUSANT TO 11 U.S.C. §303(b) AND IN FURTHER SUPPORT OF THEIR MOTION TO APPOINT A TRUSTEE**

Petitioning Creditors Alexis Morrillo, Frank Robinson, Michael Ventura, RG3 LLC, Samme Shiekah, Jonathan Gunn, Nicholas Tiah, and Faleena and Jermaine Andujar submit this memorandum of law in opposition to Whairhouse's motion to dismiss and in further support of their Motion to appoint a trustee.

**PRELIMINARY STATEMENT**

In response to an involuntary petition for bankruptcy and a motion to appoint a trustee, the alleged debtor, Whairhouse Limited Liability Company ("Whairhouse"), did not contest any of the material facts set forth by the petitioning creditors ("Petitioners"). Whairhouse did not dispute that it has been operating a real estate based Ponzi-like scheme, it did not dispute that each of the

1

Petitioners invested with it the money set forth in the joint venture agreements attached to each of their declarations, and it did not dispute that it failed to pay each of the Petitioners the profits that the joint venture agreement it prepared for each of them said they would be paid.

Instead, Whairhouse's sole opposition is based on the flawed argument that the Petitioners are not qualified creditors because Whairhouse claims there is a bona fide dispute regarding whether New Jersey's usury laws preclude each of the Petitioners from recovering the "interest" – not the principal amount which is undisputed – owed to them under their joint venture agreements. Whairhouse's argument is hopelessly flawed for two fundamental reasons. First, the joint venture agreements on which each Petitioner bases his or her claim is not a loan that is subject to New Jersey's usury laws; they are each investment contracts that are not subject to usury law.  Second, even if the joint venture agreements could be subject to the usury law, Whairhouse, as a company, is expressly precluded by New Jersey statute from asserting usury as a defense in a civil lawsuit.

As a result, Whairhouse's sole objection to Petitioners' *bona fides* as qualified petitioning creditors must fail, and this Court should enter an order for relief and appoint a trustee over Whairhouse for the reasons set forth in Petitioners' motion.

In addition, contrary to the false statements in Whairhouse's cross motion, each of the Petitioners has NOT filed state court lawsuits against Whairhouse through which they can obtain relief.  Approximately 18 unrelated plaintiffs have sued Whairhouse (and other Pina companies) in state court for fraud and breaches of joint venture agreements Whairhouse entered with those 18 other victims. (D.I.#2.2, Mack Dec.. Ex B).  As the list of state court cases set forth in Exhibit B to the Griegel Certification submitted with the opposition also demonstrates, this is not a two-party dispute but a wide-ranging fraud scheme involving multiple companies owned by Cesar and

Jennifer Pina (collectively "the Pinas") and scores of victims in New Jersey, New York and other states.

It is very telling that despite 18 lawsuits pending in state court against the Pinas and their various companies for breach of contract and fraud, the first cases in which they have retained counsel to defend are this involuntary bankruptcy case and the lawsuit filed by Messrs. Barone and Martini in Passaic County (the "Taylor Court Case"). What this bankruptcy and the Taylor Court Case have in common, and the dozens of other state court lawsuits do not, is that in both of these cases, the victims have sought the imposition of a trustee to wrest control of the companies from the Pinas. And while the Pinas have hired counsel to oppose this involuntary bankruptcy filing, they have previously used voluntary bankruptcy filings to thwart victims' state court lawsuits. Literally minutes before a state court hearing to appoint a receiver in the Taylor Court Case, the Pinas filed Taylor Court Apartments LLC ("Taylor Court") for voluntary bankruptcy, without an attorney, on a handwritten bankruptcy petition in this Court. Notably, with a pending motion to appoint a bankruptcy trustee over Taylor Court and despite this Court's order to show cause as to why that bankruptcy should not be dismissed for failure to have an attorney, the attorneys that the Pinas hired to oppose the Whairhouse involuntary bankruptcy have not made an appearance in the Taylor Court case. Apparently the Pinas are hoping that they can further delay the appointment of a trustee over Taylor Court by having that bankruptcy case dismissed by selectively retaining counsel. Jennifer Pina similarly filed two voluntary personal bankruptcies to stop state court foreclosures earlier this year, both of which were dismissed by this Court *sua sponte* after she failed to respond to orders to show cause. (D.I.#2.2, Mack Dec. Dec., ¶¶3-11)

3

The only bad faith in this case is that of the Pinas who have sought to play games with this Court's jurisdiction to gain advantages in state court litigations. Petitioners, effectively as representatives of numerous victims of Whairhouse and the Pinas' other companies through which this multi-faceted Ponzi-like scheme has been perpetrated, have initiated this case in good faith to prevent the piecemeal race to the courthouse for the Pinas' companies assets that is currently ongoing, to prevent the further dissipation of Whairhouse's assets by the Pinas, and to appoint a trustee to marshal all of the assets and unwind fraudulent transfers so that all of their victims can share *pari passu* in the recovery of the fraudulently obtained money.

This Court should stop the Pinas' game playing, enter an order for relief and appoint a trustee to take control of this situation from the Pinas.

## ADDITIONAL FACTUAL BACKGROUND

In addition to the factual background set forth in the Petitioners' motion to appoint a trustee, Petitioners set forth the following additional facts to address certain issues raised by Whairhouse's opposition brief.[1]

---

[1] Notably, Whairhouse's opposition is not supported by any evidence submitted by any person with actual personal knowledge. The opposition submitted only a certification from an attorney who attaches what he – without actual personal knowledge of the facts – states are text messages sent to his client, which have nothing to do with whether an involuntary petition should be sustained. While we obviously do not condone some of the disturbing messages sent to the Pinas, contrary to that certification, some of those messages were never sent to the Pinas by any victim, some were online posts not directed at the Pinas, and/or those messages do not reflect the complete online back and forth of the Pinas taunting their victims and their losses. In the only real exchange disclosed in those exhibits is one response in which, after being told the "feds are coming," the Pinas responded by taunting the victim and admitting to their crimes saying "**3 meals a day fed time is easy I'll come out rich and you will still be broke**." Certification of Griegel (D.I.#14.2), Ex. L.

Contrary to the statements in Whairhouse's opposition brief, none of the Petitioners entered into "loan agreements" with Whairhouse. Cesar Pina pitched to each of the Petitioners the opportunity to join with him in his "Flipping NJ" successes by investing in a specific property to renovate, flip, and earn a profit as part of a joint venture between the Pinas' company and each victim.

Each of the joint venture agreements prepared by Whairhouse for each of its victims followed the same structure. *See* Exhibit A to each declaration of each Petitioner in support of their motion to appoint a trustee (D.I. #2.2 through 2.10). For starters, each agreement is aptly titled "joint venture agreement" – not loan agreement. Each joint venture agreement then sets forth in Section II the "Purpose" of the joint venture, which "shall be for the purchase, remodel and eventual sale of the Property."

Each joint venture agreement then also makes clear that the only thing required of the investor is his or her capital investment, and Whairhouse will do everything else required to turn a profit. Each agreement recites a similar sentence that "Whairhouse LLC shall be solely responsible to purchase, remodel and sale of the Property." Most agreements also specified that "Whairhouse LLC shall be responsible to pay for any and all remodeling of the Property."

Each agreement recited in a Section V entitled "Capital Contributions / Distribution" what was the "initial capital" contributed by each investor for the joint venture.

Section V(c) of each agreement then provides "**Profits after the Sale of the Property**. Once the Property is sold Investor will be entitled to a return of their initial $[xxxxxxx] capital contribution. In addition, Investor shall be entitled to an interest payment of $[yyyyyy]."

5

Although the word "interest" is used in Section V(c), it is clearly describing the "profits after sale of the property" that will be earned on the investors "capital contribution." As set forth below, courts routinely look beyond the words through which an agreement is clothed and consider the overall structure of the agreement to determine what its true nature.

The structure here is clearly that of a person investing money and relying entirely on the efforts of the other party (here, a self-professed house flipping guru) to generate a profit for the investor. As explained below, that structure is a quintessential "investment contract" and not a loan.

Notably, in Whairhouse's oppositions to the involuntary petition and to the motion to appoint a trustee, it does not dispute that any of the Petitioners made the "capital contribution" called for by the joint venture agreement. Whairhouse also did not dispute that it promised to purchase, renovate and flip each of the properties identified in each of the joint venture agreements, but failed to do so. Whairhouse also does not dispute that it prepared the joint venture agreements and proposed the profits to be earned under each joint venture agreement. Whairhouse further admits that each Petitioner is owed their "capital contribution" under each joint venture agreement, only disputing the obligation to repay the "profit" for public policy reasons.

Unfortunately for these investors, while they were relying on Whairhouse and the Pinas to perform their obligations under the joint venture agreements, as set forth in the motion to appoint a trustee, Whairhouse and the Pinas either took their money and did not use it to purchase or renovate the property, had already sold the property before the Petitioners invested, purchased the property through a different entity, sold the property and never delivered the profits from the sale,

6

or tricked more investors to provide capital investments to purchase and flip the same property already under joint venture with the Petitioners. (Mack Reply Cert. ¶¶ 4-15)

## **LEGAL ARGUMENT**

**I.    THE COURT SHOULD DENY WHAIRHOUSE'S MOTION TO DISMISS THE INVOLUNTARY PETITION BASED UPON USURY.**

### a. Usury Laws Do Not Apply Because the Joint Venture Agreements at Issue Are Investment Contracts, Not Loans.

Besides baldly asserting with no support that each joint venture agreement is an unenforceable usurious "standard loan," Whairhouse does not provide this Court with any case law explaining how and in what circumstances usury laws are applied. Fundamentally, "[u]sury laws exist to protect oppressed borrowers" and "are designed 'to prevent avarice from preying upon necessity." *Ferdon v. Zarriello Bros. Inc.*, 87 N.J. Super. 124, 134 (Law. Div. 1965). They do not, however, exist to shield an actor like Whairhouse, who under fraudulent pretenses solicited investments from the Petitioners, many of whom invested their life savings, from contractual obligations on terms which they themselves determined. The application of usury principles in this case as Whairhouse suggests would utterly turn that important public policy on its head.

Contrary to what Whairhouse argues, the joint venture agreements are squarely investment contracts not subject to usury laws. An "investment contract" is a form of security and is defined as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or third party." *SEC v W.J. Howey Co.* 328 U.S. 293, 298-99 (1946).[2] According to the Supreme Court, the "legal terminology

---

[2] New Jersey courts expressly follow *Howey* in evaluating whether an agreement is an "investment contract." *See Manheim NJ Investments, Inc. v. Dir., Div. of Taxation*, 30 N.J. Tax 18, 35 (2017); *Matter of Bruno*, A-0967-19, 2021 WL 1140095, at *6 (App. Div. Mar. 25, 2021).

7

in which such contracts are clothed" is irrelevant; the test is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 300-301. In this type of business venture, "the investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise." *Id.* at 300. Practically, an investment contract provides the "opportunity to contribute money and to share in the profits of the enterprise to those persons who lack, for example, the experience or desire to develop the venture themselves but are "attracted solely by the prospects of a return on their investment." *Id.* at 299-300.

That is *precisely* what occurred in this case. Whairhouse promoted to the Petitioners and solicited their capital investments in a purported real estate development joint venture, that being the purchase, remodel and sale of specific parcels of real property to be performed solely through Whairhouse's efforts, as stated in the joint venture agreements. Those properties were to be developed solely through the efforts of the Debtor, with the Petitioners entitled to a share of the profits "***once*** the property was sold" – the existence of that very contingency (which has now either already occurred or will never occur because of Whairhouse's fraud as detailed in the Mack Reply Certification) confirms that these were not "loans." *See Dopp v. Yari*, 927 F. Supp. 814, 820-21 (D.N.J. 1996) (agreement was not a loan, but a joint undertaking whereby collection of the entire interest was at risk and dependent upon a "contingent event"). Even in those joint venture agreements that included a provision attempting to guarantee payment of profits by a date certain through refinancing, there was no guarantee as to how quickly Whairhouse was required to refinance, for example. *See* Declaration of Morrillo (D.I.#2.3), Ex. A at 1. Moreover, the law is

8

clear that just because Whairhouse in drafting the joint venture agreements chose to call those profits "interest" does not make it so. *See Howey*, 328 U.S. at 298-99.

On remarkably similar facts, the Georgia Court of Appeals in *Golden Atlanta Site Development, Inc. v. Nahai*, 229 Ga. App. 646, 647 (2009) held that usury laws do not apply to investment contracts like the joint venture agreements in this case. In that case, the court expressly rejected a developer's argument that its contract with an investor pursuant to which the investor paid $100,000 toward development of certain property in exchange for either $165,000 after one year or title to the property was not a loan subject to usury laws. Rather, the agreement was an investment contract for a business venture pursuant to which the investor contributed capital in a common enterprise for the development of commercial real estate and was promised a return on that investment solely as a result of the developer's efforts in developing the property.[3] *Id.* at 648. The Court affirmed summary judgment to the investor on her breach of contract claim accordingly. *Id.*; *accord. Cure v. Sussman*, 795 S.W.2d 804, 805 (Tex. App. 1990) (in a securities fraud action, rejecting usury defense asserted on an investment contract meeting the *Howey* standard that guaranteed 50% return on investments). Unsurprisingly, this case is distinct from those types of cases involving usurious contracts. *See, e.g., Ferdon v. Zarriello Bros. Inc.*, 87 N.J. Super. 124, 136 (Law. Div. 1965) (recognizing that although guarantors of a loan are typically "not likely to be overcome by financial need" and thus "not in need of protection" under usury laws, usury was available as a defense to individual borrower who, as an added price for a loan, assumed the obligation of the corporate defendant without receiving independent consideration for that

---

[3] Like New Jersey, courts in Georgia also apply *Howey*'s definition of an investment contract. *See Golden Atlanta*, 229 Ga. App. at 648 (citing *Ga. Market Centers v. Fortson*, 225 Ga. 854 (1969)).

9

additional undertaking); *Yasner v. Com. Mortg. Co.*, 120 N.J. Super. 522 (Dist. Ct. 1972) (mortgage loan compelling payment of placement fee by vendor of property in addition to interest rate agreed to by individual borrower was in effect no more than a usurious exaction on part of lender in order to permit it to circumvent prohibition against such a transaction contained in statute); *Hubschman v. Broda*, 103 N.J. Super. 494, 495 (Ch. Div. 1968) (borrower who was "in need of" $100,000 executed loan agreement secured by a bond and mortgage in exchange for $9,000 payment advanced to lender, plus annual interest beyond usury threshold and two $5,000 payments to extend the loan when borrower failed to pay on time); *cf. Herkimer Inv., LLC v. Goldstein*, No. A-5944-10T2, 2012 WL 2923342, at *7 (N.J. App. Div. July 19, 2012) (in declining to find usury in "a commercial transaction entered into by presumably sophisticated parties dealing in an expensive, high-risk, high-reward opportunity" and distinguishing those facts from cases involving "allegations of usurious interest in the purchase of a single-family home"). Such cases demonstrate a threshold flaw in Whairhouse's attempt to characterize these joint venture agreements as subject to usury laws that are designed to protect oppressed and oftentimes desperate borrowers lacking adequate leverage, unlike Whairhouse.

Thus, the usury laws are inapplicable to the investment contracts at issue, and there is no *bona fide* dispute as to the amount owed to each of the Petitioners.

### b. As A Limited Liability Company, the Law Prohibits Whairhouse from Interposing a Usury Defense.

Whairhouse's assertion of usury as a defense to dispute the amount of "interest" owed to the Petitioners also fails because New Jersey law expressly precludes limited liability companies like Whairhouse from asserting usury as a defense to its obligations. N.J.S.A. §31:1-6 states plainly, "No corporation, limited liability company or limited liability partnership shall plead or

10

set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation, limited liability company or limited liability partnership." The New Jersey Supreme Court has reinforced the impact of the statute as preventing corporate entities from asserting usury. *Gelber v. Kugel's Tavern*, 10 N.J. 191, 195-196 (1952) ("If, however, the loans are actually made to the corporation, direct, usury is not a defense even to endorsers of corporate obligations issued for loans."); *Tabatchnick Realty Group, LLC v. PNC Bank, N.A.*, 2007 U.S. Dist. LEXIS 10468, *9 ("The New Jersey usury statute specifically excludes corporations like [the plaintiff] from its protection.")

Incredibly, Whairhouse's opposition brief makes no mention of this express prohibition on its ability to raise usury as a defense in a civil action as it tries to do in its Cross-Motion. Accordingly, Whairhouse, being a company, cannot raise usury in defense of its obligations under the joint venture agreements nor use it in its red herring effort to manufacture a *bona fide* dispute as to the amount owed to the Petitioners.

### c. The "Interest" Does Not Exceed the Maximum of 50% Permitted by Law.

Alternatively, even if Whairhouse could raise usury as a defense and even if the joint venture agreements were viewed to be loans subject to usury laws – which they clearly are not – the "interest" promised in those contracts does not exceed the maximum of 50% permitted by New Jersey law. A loan to an entity violates the criminal usury statute only if the interest charged exceeds an annual rate of 50%. N.J.S.A. 2C:21-19(a). The joint venture agreements do not define an interest rate in excess of 50%, they simply guarantee a specified return and estimate that it will be paid in approximately 4 to 6 months. Unlike the way "interest" payments normally work, the Petitioners do not receive more or less "interest" depending on how quickly or how slowly they

are paid back. Whether the property is sold in two months or eight months, they receive the same amount of profit. If the profit is paid in less than 7 months, then the per annum return would exceed 50%. But in each of the joint venture agreements, there was no guarantee of a return in less than 7 months, just an estimate. If, for example, the specified property is not sold for 7 months and 6 days and the profit is paid at that point, the per annum return would be less than 50%. In other words, by Whairhouse's logic, each month that the "interest" is not paid decreases the per annum interest rate. In the case of each the Petitioners, it has been more than 7.2 months since they signed their joint venture agreements and they have not been paid, so the per annum "interest rate" they are each seeking is less than 50%. The joint venture agreements thus do not exact "interest" beyond the maximum threshold for criminal usury applicable to corporate obligors, were that test to even apply in this case.

### d. The Joint Venture Agreements Are Not Void.

Despite what Whairhouse apparently hopes to achieve, neither the civil nor criminal usury statutes "provide for the avoidance of usurious contracts", even if a usurious contract were found to exist here. *Schuran, Inc. v. Walnut Hill Assocs.*, 256 N.J. Super. 228, 231 (Law. Div. 1991). Legally and in essence, "usury" requires an "unlawful or corrupt intent, an intent to do what the law prohibits, namely to take for the loan or forbearance of money something in addition to the six percent per annum that the statute allows." *Altman v. Altman*, 8 N.J. Super. 301 (Ch.1950). It is not enough to presume "that there was a corrupt bargain" as Whairhouse does. *Id.* at 307; *see also Maltese Holding Corporation v. Crowley*, 8 N.J. Misc. 86 (Ch.1930) ("Corrupt bargain to contravene statute must be established to sustain plea of usury."). The facts are simply devoid of any notion that the Petitioners entered into the joint venture agreements seeking an agreement with

12

knowledge of any illegality. Rather, the Petitioners entered into the joint venture agreements based on what Cesar Pina, one of Whairhouse's principals, made them believe was a safe investment, with backing of celebrity endorsement to give the veil of legitimacy, based upon their claim to be successful real estate flippers. *See, e.g.*, Declaration of Michael Ventura (D.I.#2.5), ¶ 2; Declaration of Roman Garcia (D.I.# 2-6), ¶¶ 1-4; Declaration of Samme Sheika (D.I.# 2-8), ¶¶ 2-3.

As a matter of equity, application of the doctrines of *in pari delicto* and unclean hands to these facts is compelling, where the principals of Whairhouse, who by every indication were operating a Ponzi-like scheme – which they notably have yet to deny in any court – callously seek to invoke the doctrine of usury to skirt their obligations on terms that they dictated to the Petitioners. In other words, Whairhouse accuses the Petitioners of wrongdoing under usury laws only to benefit from its own wrongdoing. *Terlecky v. Hurd (In re Dublin Sec.)*, 133 F.3d 377, 380 (6th Cir. 1997) ("The doctrine is premised upon the equitable principle that "no Court will lend its aid to a man who founds his cause of action upon an immoral or illegal act."). Bankruptcy courts have thus applied *in pari delicto* to prevent operators of Ponzi schemes from relying on usury, which also confirms the unique suitability of the bankruptcy forum to preside over this Ponzi scheme type case. See e.g., *Burkart v. Bisessar (In re Singh)*, 2015 Bankr. LEXIS 1440, at *21 (Bankr. E.D. Cal. Apr. 22, 2015) ("[T]he court has no trouble concluding that the policy underlying the usury law; namely, the protection of the needy and unwary borrower, does not apply to the debtor, and that the policies supporting the *in pari delicto* doctrine do apply to his transactions with investors."); *Seror v. Farias (In re L.D.T Invs., Inc.)*, Nos. 1:11-bk-22664-MT, 1:12-ap-01360-MT, 2017 Bankr. LEXIS 1029, at *23 (Bankr. C.D. Cal. Apr. 13, 2017) (concluding there was a *prima facie* showing that the defense of *in pari delicto* applied in a Ponzi scheme case, and granting

summary judgment against trustee on the usury claim accordingly); *see also Goldin v. Primavera Familienstiftung Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 330 (Bankr. S.D.N.Y. 1996) (recognizing that "in pari delicto . . . generally applies to Ponzi schemes or other illegal transactions").

In a similar vein, courts have estopped a debtor who induces a usurious transaction from later claiming usury as a defense. *See Wesley v. DeFonce Contracting Corp.*, 216 A.2d 811, 814 (Conn.1966) (estopping corporate borrowers from asserting a usury defense to avoid obligations to an elderly individual in a transaction for which such corporate borrowers set the terms of, supplied the note, and persuaded the individual not to consult her attorney, emphasizing that "this was not the ordinary commercial transaction"); *Jue v. Bass,* 299 F.2d 374, 378 (9th Cir. 1962) ("[W]hen a borrower fraudulently inserts a usurious interest rate in order to later defeat recovery against him, . . . he may be estopped from using the defense of usury."). Absent estoppel in this circumstance, fraudulent actors would be rewarded for inducing contracts in excess of maximum interest that they can later avoid repayment by claiming usury.

Both the law and the equities command enforcement of the joint venture agreements in this case and the Court should reject any claim by Whairhouse that these agreements are void.

For the multitude of legal and equitable reasons set forth above, there is no "meritorious contention as to the application of law to undisputed facts" and therefore no *bona fide* dispute raised in this Petition under Section 303(b). *B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir. 1989); *In re AMC Investors, LLC*, 406 B.R. 478, 483-84 (Bankr. D. Del. 2009) (quoting *Busick*, 831 F.2d at 750).

**II.    THE COURT SHOULD DENY WHAIRHOUSE'S MOTION TO DISMISS BECAUSE THE PETITION COMPLIES WITH SECTION 303(b).**

Even if the Court somehow concludes the joint venture agreements are usurious, and the Petitioning Creditors are not entitled to full repayment, which the Court should not for the many reasons set forth above, the Petitioners remain bona fide creditors properly before this Court under Section 303(b).

Whairhouse asserts that the Petitioners are disqualified because a portion of their claims (the so-called "interest") are allegedly subject to a *bona fide* dispute. However, the Court should reject this argument. Following the 2005 amendments to the Bankruptcy Code resulting from the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a holder of a claim is qualified to be a petitioning creditor in an involuntary bankruptcy case where that creditor's claim "is not contingent as to liability or the subject of a *bona fide* dispute *as to liability or amount*." 11 U.S.C. § 303(b) (emphasis added). Courts are split regarding whether the addition of the phrase "as to liability or amount" automatically disqualifies a petitioning creditor whose claim is only partially in dispute. *See, e.g., In re DemirCo Holdings Inc.*, 2006 Bankr. LEXIS 1131 (Bankr. C.D. Ill. June 9, 2006) (*bona fide* dispute regarding portion of creditor's claim does not disqualify creditor: *bona fide* dispute is relevant only if it has potential to reduce total amount of petitioning claims below statutory threshold); *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 626–27 (Bankr. N.D. Okla. 2005) (because $28,000 of petitioning creditor's $83,000 claim was objectively undisputable, creditor held undisputed claim in excess of the statutory minimum and was therefore qualified petitioning creditor); *but see Regional Anesthesia Assocs. PC v. PHN Physician Servs.* (*In re Regional Anesthesia Assocs. PC*), 360 B.R. 466, 470 (Bankr. W.D. Pa. 2007) (under the 2005 amendments, any dispute regarding amount when dispute arises from same transaction and is directly related to underlying claim makes claim subject to *bona fide* dispute); *In*

15

*re Euro-American Lodging Corp.*, 357 B.R. 700 (Bankr. S.D.N.Y. 2007) (as result of amendment, any dispute regarding amount that arises from same transaction and is directly related to underlying claim should render claim subject to bona fide dispute) (*dictum*). As noted in Colliers, the "better view" is that the BAPCPA amendments do not automatically disqualify a petitioning creditor if only a part of its claim is in dispute. *See* 2 Collier on Bankruptcy P. 303.11. The reasoning in *DemirCo Holdings* is compelling on this point, where the court noted:

> With the dearth of committee comments and legislative history available to interpret BAPCPA, this Court cannot presume that Congress added the phrase "as to liability or amount" with the intent that the claims of involuntary petitioners must now be fully liquidated either by agreement or judgment so that no dispute exists as to any portion of such claims. Without clear legislative intent, this Court cannot presume such a change in the law and declines to do so.

*DemirCo Holdings*, 2006 Bankr. LEXIS 1131, at *9; *accord In re Project Restore, LLC*, 2022 Bankr. LEXIS 2868 at *6 (Bankr. M.D. Tenn. 2022); *In re Seven Three Distilling Co., LLC*, 2021 Bankr. LEXIS 1790, at *24 (Bankr. E.D. La. July 6, 2021); *In re Williams*, 616 B.R. 690, 694 (Bankr. N.D. Tex. 2020); *In re 3 Man Corp.*, 2014 Bankr. LEXIS 3675, at *12 (Bankr. M.D. Pa. Aug. 29, 2014). Indeed, as the court in *3 Man* noted, "[t]aken to an extreme, if $99,900 of a $100,000 debt was undisputed but $100 was disputed, an alleged debtor could seek to disqualify the petitioning creditor." *3 Man Corp.*, 2014 Bankr. LEXIS 3675, at *12. As noted by the *3 Man* court, that result is "absurd." *Id.*

This Court should adopt the reasoning in *DemirCo Holdings* and *3 Man* and reject Whairhouse's absurd argument that a conveniently and newly manufactured dispute as to a portion of the Petitioners' claims automatically renders them disqualified. As discussed in *DemirCo Holdings*, there is simply no basis to conclude that the BAPCPA amendments were designed to

16

disqualify a petitioning creditor where the undisputed portion of its claim exceeds the statutory thresholds set forth in section 303 of the Bankruptcy Code. Additionally, as discussed in *3 Man*, Whairhouse's interpretation of section 303(b) could lead to absurd results. Whairhouse admits that "the [Petitioning Creditors] may be entitled, in the best case, to recover no more than the amount or value actually lent . . ." Cross Mot'n, p. 4. Given that the amount of capital invested by each of the Petitioners was no less than $100,000, far in excess of the statutory threshold for qualification to file an involuntary petition, this Court should deem the Petitioners qualified to file the involuntary petition.

**III.     PETITIONERS FILED THIS INVOLUNTARY PETITION IN GOOD FAITH.**

Even if this Court grants Whairhouse's motion to dismiss, it certainly should not find that the Petitioners' involuntary petition was filed in bad faith. Under Third Circuit precedent, this Court has discretion to determine based on "the totality of the circumstances" whether an involuntary petition was filed in bad faith or not. *In re Forever Green Ath. Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015) (explaining bankruptcy courts should conduct a fact intensive examination and consider any number of factors to assess the totality of the circumstances).

Here, it is undisputed that the Petitioners are the victims of a wide-ranging Ponzi-like scheme that has been perpetrated by the Pinas using multiple companies and victimizing scores of people. Rather than file eight more individual lawsuits in state court against Whairhouse and join in the ongoing race for Whairhouse's assets, Petitioners filed this involuntary petition – in the same court that the Pinas had already voluntarily filed Taylor Court Apartments for bankruptcy -- to consolidate all creditors' claims so that all creditors could share fairly in a recovery. Ponzi scheme cases regularly are resolved through the bankruptcy courts precisely because this Court is much

better suited than state courts to unravel Ponzi-schemes, the inevitable fraudulent transfer of assets involved in Ponzi-schemes and overseeing equitable distribution of assets to creditors. *See, e.g., In re Engler*, 500 B.R. 163, 165 (Bankr. M.D. Fla. 2013) (involving an involuntary petition filed to "put an end to" the Ponzi scheme being operated by the debtor); *Barnard v. Albert (In re Janitorial Close-Out City Corp.)*, Nos. 09-7982-AST, 11-8952-AST, 2013 Bankr. LEXIS 523, at *2 (Bankr. E.D.N.Y. Feb. 8, 2013) (same); *In re Applegate*, No. 05-67759, 2007 Bankr. LEXIS 4184, at *2 (Bankr. N.D. Ohio Dec. 12, 2007) (same).

Moreover, given the Pinas' own bad faith track record of filing bare bones voluntary bankruptcy petitions merely to delay and thwart victims' pursuit of them in state courts, it may only have been a matter of time before they would have filed a bare bones voluntary bankruptcy petition for Whairhouse itself – especially now that at least one creditor has recently obtained a default judgment against it. (Mack Reply Cert., Ex. A). Given the amount of money owed to so many victims, Whairhouse will likely eventually wind up in bankruptcy one way or another. Since this Ponzi-like scheme was first exposed in June of this year, the Pinas have had unfettered ability to move and hide assets, and the clock is running on the preference and fraudulent transfer periods. These Petitioners simply sought to initiate that process now (after it was initially begun voluntarily by the Pinas'), before too much time has passed, to preserve the assets of the estate for the benefit of all victims.

Therefore, even if this Court grants the motion to dismiss, it should deny Whairhouse's request to find this was a bad faith filing and deny its request for legal fees.

## CONCLUSION

For the foregoing reasons, this Court should deny Whairhouse's cross-motion, enter an order for relief against Whairhouse and appoint a trustee.

Dated: September 29, 2023              **PASHMAN STEIN WALDER HAYDEN, P.C.**

                                       */s/ Sean Mack*
                                       Sean Mack
                                       Darcy Baboulis-Gyscek
                                       21 Main Street, Suite 200
                                       Hackensack, New Jersey 07601
                                       (201)488-8200
                                       smack@pashmanstein.com
                                       dbaboulis-gyscek@pashmanstein.com

                                       *Attorneys for Petitioning Creditors*